Good morning. Robert Rexford for the Apollo and Antonio Reyes. You know, as I was preparing for argument, and unfortunately reliving this trial, I was struck yet again at the centrality of the disputed phone records that would be going to be going to my client. The dispute of what? The disputed phone records, the cell phone tally records that were going to be used to try. So with the panel's permission, I'd like to begin by discussing those records. I'd like to begin by underscoring my position that indeed when the representative from Sprint testified, he testified as an expert witness because this evidence that the government put before the jury really was quite powerful for their case. When this supposed custodian of records testified on direct examination, he told the jury certain things like what your cell phone is going to do when you are making or receiving a call is search for the cell phone tower that is emitting the strongest signal. I don't know how a custodian of records knows that. He goes on to discuss a cell phone's radius, but he goes even further than that. He actually renders an opinion. He is asked whether it's possible for a cell phone in a particular location to register on a cell tower at another location. And his answer, and this is an excerpt of record 37, his answer is, quote, it would be impossible for a cell phone to make a connection to a cell tower 286 miles away. And that specific quote is at my second volume of excerpt of record at 263. Again, he says, it would not be possible for a phone in San Felipe to register on a tower in Mexico. Kagan. Now, as I recall, you said something at the time you were contesting whether he could testify about him not testifying as an expert, but they said he wasn't going to testify as an expert. That was the government's position. I don't know about you, but whoever it was. But did you ever object when it actually happened? No, but I believe the issue is preserved, and here's why I believe that. The discussion that I believe you are referring to happened right before trial began, and we were discussing when these records were disclosed, what this gentleman would testify to, those kind of things. My position was that he would be an expert.  And at the end of that discussion, Judge Anello says, in terms of admissibility, we'll wait and see how it turns out. If there's some issue there, we'll deal with it at that time. Now, that's at the end of me arguing that this is going to be expert testimony. I haven't received notice, all those things. Now, with a caveat, I didn't say during that discussion, and it was me, by the way, I didn't say during that discussion that he was going to render an expert opinion as to how cell phones work, because I didn't know that was coming. When the government moved those records into evidence, I did make an objection, and the government cites my objection in their response brief, objection foundation. That's the extent of the objection cited by the government. But that wasn't the entirety of my objection. My objection is actually on the second volume of my excerpt of record at 251. And, indeed, I say objection foundation, and then I request voir dire. I'm sorry? I request to voir dire the witness as to his ability to testify about these records. My request is denied by the judge. When the Sprint custodian, so I think that preserves the issue. That's what I've got. When the Sprint custodian starts opining about what's possible and what's not possible, there's not a contemporaneous objection. I don't know why I didn't. I really can't tell you. Like, similar to the first case that was argued today, I'm not going to know if I'm not testifying, but I honestly don't have a recall. Whether I was consulting with my client, I drifted off, I really don't know. But that's why I think the issue is preserved, because I think that sequence of events and the denial of the opportunity to voir dire the expert preserves the issue. Because, I mean, that kind of testimony, that's far different than I work for Sprint. Did you ask to file a written offer of proof? On this issue, no. I did not. You didn't have proof. You were trying to object to the proof, not to present it. Yes. This was the government's witness, but I didn't, later in the trial, I didn't go back saying, Your Honor, this is what I would have asked on voir dire. I did not do that. So I didn't write that written objection. Well, not then or later. So, all right. So you were caught by surprise. I'd like to say, also, I don't recall why I didn't object. How does this ultimately hurt you? I mean, given that there was lots of other evidence of his guilt. I actually, I think the phone records are very important to the government's conviction, and I'd point to a couple of things. It was displayed prominently in the government's opening statement, and it was displayed prominently in the government's closing statement. And I had an opportunity to go through, and I'm flipping through my outline to get to that point. The government argues that there's overwhelming evidence of my client's guilt, and then what they essentially do is, and this is at the red brief at page 20, they talk about there was marijuana in the car. Well, obviously, we wouldn't be here. There may have been nervousness at the border. There was an ambiguous response to a question. Were you in San Felipe or were you in Mexicali? The government characterized that as a lie at trial. But most importantly, they used the phone to try to prove that that was a lie. That was the import of the phone evidence to the government, and then the phone itself. And to support their conclusion that this is overwhelming evidence, the government cites a number of cases, but those cases are Rule 29 cases, and they stand for the very simple proposition that a rational juror can look at a driver's sole occupant and infer knowledge. A rational juror. That's not the same thing as harmless beyond reasonable doubt. What about you sort of in passing raised a Fourth Amendment issue. Yes. Right. I must say that it somewhat disturbs me to have this be raised on plain error and in passing because it's a very important issue, which has engaged a lot of courts recently. There's also a statutory issue, and we sort of have this little weird piece of it the way you've raised it. And I have a predecessor question, which is, can you do plain error with regard to exclusionary rule questions? Have you ever seen that? I'm taking a moment because I've never thought of that question. I have not seen it. No, I'm not sure I've seen it either. Whether that means it doesn't exist is a different question. I just don't know. I think the Fourth Amendment issue is preserved, and here's why. I actually received notice that they were going after these records, I think by accident. These things are generally ex parte, but it was popped up on the electronic filing system. That same day that popped up, I filed a written objection to that, and I said, look, before you go and get it, there are Fourth Amendment issues, there are statutory issues. And then my second request. You did say the words Fourth Amendment. I did say the words Fourth Amendment. And then my second request was for a status on this very issue because we weren't back in court until a month later. My request, which was addressed, even though a magistrate judge issued the subpoena for the government, my request to be heard on it was filed in front of the district court. That was denied. My request, my written filings, was denied four days later. Now, this is way back, I think, in August. The next time the phone records materialize, the next time they literally appear in the case is five days before trial. I did incorporate my written objections at trial when we were discussing the admissibility of these. But you didn't even make a Fourth Amendment objection, as I recall. You said something like, there might be one, I have to research it. That is true. That is true. I'm not saying it's a perfect record. I think the court could find that it's preserved based on that sequence of events. Because I don't feel as though I was given an opportunity to be heard on the matter. Was I strident enough in requesting that opportunity? I think you could have gotten up at the trial and said, I object these are improper under the Fourth Amendment, which you didn't do. Well, I believe. And plus, there's this whole statutory question, which you don't raise at all, which makes it very difficult for us, because ordinarily we have to look at the statute first. And there's, you know, this Third Circuit opinion. There are a whole bunch of magistrate judge opinions all about the statute. And you haven't raised the statute at all. Well, I actually think I have. Whether I've raised it specifically enough is I do, in my opening brief, I do say that the information that the government acquired, and I'm being specific about a specific type of information, namely the cell phone towers and their location that this phone was essentially pinging off of, it's just not listed in the statute as the type of information they can acquire. The statute actually reads. Where did you say that? I'm sorry. When? Just tell me generally when. I believe in my opening brief. To us, but I'm talking about to the district. Oh, no. I'm sorry. I moved off of what I preserved. That is what I have in the preservation of the issue. All right. Would the Court like me to continue on that one? Go ahead. What the statute authorizes the government to seek, and this is 18 U.S.C. 2703 in subdivision C-1, is that, for our purposes, an electronic communication service disclosed, quote, a record or other information pertaining to a subscriber to or customer of such service. Now, the Third Circuit case that you mentioned, they're specific that there's no dispute in that case as to whether or not the cell phone tower data met that definition. And everybody seems to be assuming that, and I agree with you. I don't know why, but there may be some. This is another problem. The briefing in this case is so poor on a really important question. There may be some reason for this assumption, and I don't know what it is. I don't know what it is either, Your Honor. And I'm just – that isn't – cell phone tower information isn't a record relating to an individual who's subscribing. It's relating to where that individual is going. It doesn't – it doesn't – Well, that's my interpretation. It does pertain to that subscriber. And it is my interpretation. Otherwise, it wouldn't have any relevance. Obviously, they use it to prove the location of your client. Yes. So it does pertain to where he is. As a technical matter, it's a way for them to track the cell phone. Yes, and I think that is very dangerous. Well, it may be. GPS devices, when they're attached in the driveway to a car, this circuit has said there's no expectation of privacy in parking your car out in the driveway. I agree. So why is cell phone usage where you're transmitting information over to – over the airways to the phone company, data that clearly the phone company gets, why is that – why do you have an expectation of privacy in that? The short answer is the difference between where a cell phone can go and where a car can go. What's the difference? The difference is that a cell phone routinely – What if you have your cell phone in your car and you don't have a GPS otherwise? Then would you say, well, then when it's in the car, they could pick it up, but once it's out of the car? I'm not saying that. You're not being facetious. I mean, that's exactly – some people turn their cell phones on and have them in the car. I'm not trying to be facetious either. I'm saying that there is a principled way to distinguish Pineda, and that deals with a car and where a car can go. And Pineda itself notes at footnote two that, look, if we start talking about mass surveillance of cars, that might be a different issue. More importantly, the rationale of Pineda is, look, this is squarely within the Supreme Court case where you put a beeper in a can and you track the can. But as the Third Circuit – I believe it's the Third Circuit case was discussing – it's a little bit different with a cell phone because a cell phone can go inside a home. No, it can't. Okay. That's why I was confining my hypothetical. So just to bring it back to this case, how did they use it? To prove where he was other than in a car, or did they track it inside houses and the like? All they needed to do, wasn't it, was to provide a geographical – And that's exactly what the government did in this case. So in this case, it wasn't used any more broadly than a GPS on the car. But I don't think the Fourth Amendment issue depends on what use the evidence is put to. It's whether the evidence is properly in the possession of the government to begin with. Well, if we would have to wrestle – and I think I agree with Judge Berzon. I mean, we may be engaging in a somewhat hypothetical discussion given the way this has emerged. But just this very issue alone would require us to decide to distinguish, as you say, a cell phone tracking from a GPS tracking on a car. And the basis is that they can't get it at all, because even though it could be used in the car, it could be used elsewhere. So we would use a case in which all they basically did was the equivalent of putting a GPS device on the car. That's all they needed. That's all they needed in this specific case. We don't have a case with facts that talks about how it really crossed the line. Whereas in Pineda, it was important where the car was. It was in the driveway. It wasn't in the garage. That made a big difference to the analysis. And so that's the problem I have with this. We're engaged in an interesting discussion, but it's a little difficult to bring this case home on it. If I could make one point on that. I think the import of where the car was in Pineda is because there was a preliminary issue that had to be decided, whether or not that was correct. Yes, precisely. It violated the Fourth Amendment then. Well, it was where you had an expectation of privacy. Precisely. But I think because cell phones do go into homes, and because the Knott's case says it works. Not just in homes, but in buildings in general. Precisely. And just because in this case the government didn't need to show that Mr. Reyes was in a particular building, in a home, in a hotel room, wherever, any place where we do have an expectation of privacy. You know, so I have no question that this is an important case in all of the lines we're drawing. But it also, there are cases where they say you can, you know, the phone that is in the home, under Supreme Court authority, can be pen registered and the like because you don't have expectation of privacy. You know that the data you're disseminating, based on your usage of a phone, wherever it is located, is going to be accessible to a third party. There are all sorts of issues that are bound up in this case. Agreed. So to... To distinguish that is the actual numbers being dialed is different than a person was in a particular location at a particular time dialing those numbers. And even the statute makes a distinction between whether they're intercepting the content or they're intercepting more generic data. And we've got the same thing with the use of the internet. I have an opinion that had to go through all of this analysis with respect to URLs and how whether that was covered by the Fourth Amendment. So I agree it's complicated. I'd like to save about a minute and a half for rebuttal if I could. You're over. Oh, am I? I'm over eight minutes. I thought I was at eight minutes. No questions asked. You're always eight minutes and 23 seconds. We'll deduct it from your ten minutes that the next case erupts. That's fine. Thanks. Good morning, Your Honors. May it please the Court. Daniel Butcher on behalf of the United States. I would like to start with the issue of whether there was the issue preserved with respect to both the expert testimony regarding the Nexdale custodian records and the Fourth Amendment issue. And this Court's precedent has made it clear in the Archdale case that unless a litigant obtains a clear and definitive pre-trial ruling from the district court, either allowing evidence or excluding it, that litigant must raise an objection at the time the evidence is offered. Here, there was no objection raised to the expert or the reported expert, the Nexdale custodian of records, on the grounds that he was an expert. And there was no Fourth Amendment objection that was raised either to those records. Now, counsel mentions that he did make an objection on the grounds of lack of foundation and requested voir dire. And if the Court were to look at the record, the events that led up to that lack of foundation objection was a business records foundation that was laid by the prosecutor, that these records were kept and maintained in the ordinary course of Nexdale's business, etc. At that point, after that lengthy call to establish the business records foundation, there was an objection made when the records were offered into evidence, and the objection was lack of foundation and requesting voir dire. Now, I think a district court at that point would reasonably say that he's objecting to the business records foundation and is requesting to voir dire the custodian on whether these are, in fact, business records or not. And a district court was perfectly satisfied with the business records foundation that had been laid and, perceiving that as the only objection, admitted the records. And here we are. I agree with Your Honors that this is a complicated issue, the Fourth Amendment issue, and there have been courts that have gone different directions on it, magistrate courts. And as the Court is aware, the Third Circuit has held that these records can be obtained pursuant to an order issued under 2703D and that there is no probable cause requirement that's at issue. And that certainly is something that on plain error review the Court should affirm here. This is different. What about the answer to it? Do you have any idea what the answer to my question is, which I don't because it only occurred to me this morning, whether plain error review applies at all to an exclusionary rule claim, which these essentially are. That is, these are not claims that there was anything wrong with the sort of truth-deciding function of the trial, but rather that something that went on outside of court, i.e., that these documents were obtained and people's privacy interests were interfered with, should lead to a prophylactic exclusion. Are there cases? I mean, my very short look suggested there are a couple cases where plain error has been entertained in these circumstances, no discussion of the problem, and nobody ever won. Do you have any sort of off-the-cuff sense of this? I don't have a case to cite to Your Honor because I didn't anticipate that issue. I'm happy to take a look when I get back and submit a 28-J letter to the Court if that would be helpful. I'm perfectly happy to do that. I'm somewhat curious because it occurs to me that plain error, the problem is this. I mean, government gets up all the time and argues that there's no plain error. But as I understand our plain error standards, the error doesn't really have to be plain in the sense that it was obvious at the time. It can be plain because we now say this is the law. So if that's the truth, if that were to happen, if we were to decide that there was a Fourth Amendment exclusion, I really should have applied, why wouldn't there be plain error? Well, the Court then needs to move to the – assuming the Court can get past step one, find the error. I understand that. But I'm saying that's not much use to you. So after that, what? Yes. After that, the Court then needs to ask the question, well, was there some manifest injustice that occurred as a result of this error that the Court needs to solve? Well, again, I mean, that sort of leads to my question because the question is can the have been there for other reasons? Yes. And even under that standard, I would argue that there would be certainly no manifest injustice here. But it does kind of boil down to the Fourth Amendment ultimate issue. But I don't see any manifest injustice in tracking an individual far away from his home in Los Angeles down to Mexico, and not with any precision at all, either. The testimony in the record before the Court was that his location can only be ascertained with any level of confidence. Well, he could have been visiting his girlfriend there. He could have been, you know, doing a lot of things that he wouldn't want the world to know about. And – The fact that he was in Mexico and in a particular town in Mexico and has somebody who knows him, it might be meaningful information. Understood. And that also is the case, however, with the Pineda case where there was a bumper beeper, the Supreme Court's decision in Knotts and Caro that these are the types of things that the Supreme Court has held that is type of loose surveillance. And I would point out that the type of surveillance that was at issue in Pineda and Knotts and Caro involving GPS devices fixes the location of the individual much more precisely than the information that was obtained after the fact. But my understanding is, and this is another reason why the record of this case is so useless, is that from the records of other cases it appears that the ability to pinpoint people on cell phones is becoming more and more precise, and indeed the FCC is requiring it to become more and more precise. So it's all this massive slippery slope if you start – and this whole area of the Fourth Amendment has been a massive slippery slope. You can follow somebody, therefore you can track them with one kind of device, therefore you can track them with another kind of device, therefore you can track them all the time, therefore you can track them even when they have on their cell phones. You know, it just keeps moving and moving and moving. And the question is, and the D.C. Circuit opinion and Maynard tried to argue that there's a stopping point. And the question is, how do we know this isn't a stopping point? Well, because number one, the record in this case is that the location of the individual could be only fixed within two to ten miles. And this is the type of – these issues that the Court has concerned – has raised as concerns about the capabilities of cell phones, it's the type of information that could have been elicited and should have been elicited in the district court in a full-fledged suppression hearing, where the court would be reviewing a record that answered a lot of these questions. I can tell the Court, for example, that the capabilities of monitoring a cell phone in real time, right, when the phone is being used, can locate that cell phone much more precisely than the information that we're dealing with here, which is an after-the-fact analysis using historical records from the cell phone company, where we can only do as well, based on present technology, of two to ten miles. Well, when there's real-time monitoring going on, especially with respect – GPS device installed, you can do much better than that, much more precisely. Even when there's no GPS device installed, there's a technology called triangulation. Again, not an issue here, but something that a cell phone company and agents are capable of doing in real time to – using the various three faces of the cell tower and detecting relative strength of the signal on those three faces, doing a much better job of identifying where that cell phone is in real time than they ever can do after-the-fact, as in this case with the historical cell phone records. So again, that – About a few, like my BlackBerry, unless I lost the application, that it gives you the latitude and the longitude. That's right. Right down to seconds. Now, if it's turned off, can someone come up with that information? Well, I don't know the answer to that. Again, after-the-fact, I don't believe so, but there may be a cell phone company that does retain, historically, GPS data with respect to a BlackBerry or other device. I don't know the answer to that question. Again, it's the type of thing that could and should have been developed in the record below, but happily, that's not our facts here. So could you – Let me just ask you this. So you followed the procedure to get copies of the cell phone records. Yes. Could you have just issued a straight subpoena? Do you just take them to bring them in? No, Your Honor. We applied for a court order directing the cell phone company to release and disclose the records to us, and that order was applied to pursuant to 18 U.S.C. I mean, could you have used the – But I know that in the past, and it's gone on for a long time, where the government would subpoena telephone records. Then you use that person's record to see who the person called, and then you make these lines, and you show how all these co-conspirators are phoning each other when one hangs up something, the other party immediately makes a call to someone else and you kind of follow what they're doing. Those are just, I believe, obtained just by a subpoena. Congress has provided some special protection for cell phones, and under 18 U.S.C. 2703, there is only very limited information that can be obtained pursuant to a subpoena. But when you get the records of a particular cell phone's use, do those records tell you where the call originated? I take my BlackBerry, and I'm in London, and I make a call. Does my bill show that the call came from London? Your bill may have a zoning charge or, what do I want to say, the roving charge, right? You're out of the country, so you're no longer within the service area of your provider, and you may get an extra charge. I've seen those on my bills where it shows that I made a call from outside of my service area, and that shows up on the bill. It's a roving charge. Thank you, Your Honor. I appreciate that. They don't do it anymore. Right. Now I've got a better service plan where I don't see that so often. I'm really in favor of abolishing all cell phones. Have you ever been called by Judge Pregerson at the middle of the day or night on a cell phone? I don't believe him. So, succinctly, if you were to tell us why this issue was not properly before us, what would you say? Well, simply it wasn't raised below. I understand that. Then we have plain error doctrine. Yes. Okay. Well, I would cite the court to Pineda, to the Carolingian. That's the merits. Pardon me? That's the merits. Yes. All right. So you're saying, so you haven't answered my question. Pardon me? You haven't answered my question, because you seem to be saying it is before us, because you're saying it wasn't raised below, but that leads to plain error, and then you go right to the merits. You don't seem to have a reason why we shouldn't reach the merits under plain error. No, and that's what I've argued in my brief, that it is before the court on plain error review. The merits are. Yes. That's the position I've taken in the brief that it's before the court. It's not plain error, because this isn't any worse. In fact, it's less worse than Pineda. Exactly. And there was good faith on the part of the. And that same rule would apply if it weren't plain error. Yes. Yes, but. Right. Then, yes. So you really want us to reach the whole merits of the question. Well, subject to my research, when I get back to my office in a 28-J letter that I'll send to the court that hopefully will provide the court an answer one way or the other to Your Honor's question. Okay. Thank you. Thank you. Thank you. All right. Go ahead. Let's see. Thank you. This record is my doing. My job sometimes is trying to snatch something out of almost a parent's defeat. There is an option this panel can take, and I don't see anything wrong with it. The court is unhappy with the state of the record. I asked for a status on the issue. My request was denied. The next time we were before a judge discussing the records was the day of trial. It's not realistic to say, hey, we've got a jury outside waiting. Well, then what's your suggestion? You can remand it for development of the record before the district judge securely.  before a judge referred it to the district judge. Thank you. Thank you. And the last matter on our calendar, United States for Jose Leonardo Nunez-Beltran is submitted. Thank you very much. Thank you, Bob. And we'll adjourn or recess until 9 a.m. tomorrow morning. All rise.
judges: Pregerson, Fisher, Berzon